FILED

2013 Sep-24  PM 01:27
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ALABAMA
JASPER DIVISION

| | | |
|---|---|---|
| JENNIFER A. GURGANUS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 6:11-CV-4262-SLB |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

The plaintiff, Jennifer A. Gurganus, brings this action pursuant to the provisions of section 205(g) of the Social Security Act (the Act), 42 U.S.C. § 405(g), seeking judicial review of a final adverse decision of the Commissioner of the Social Security Administration (the Commissioner) denying her application for disability insurance benefits and Supplemental Security Income.  Plaintiff timely pursued and exhausted her administrative remedies available before the Commissioner.  Accordingly, this case is now ripe for judicial review under 205(g) of the Social Security Act (the Act), 42 U.S.C. § 405(g).  Based on the court's review of the record and the briefs submitted by the parties, the court finds that the decision of the Commissioner is due to be affirmed.

## I.  STANDARD OF REVIEW

The sole function of this court is to determine whether the decision of the Commissioner is supported by substantial evidence and whether proper legal standards

were applied.  Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983).  To that

end this court "must scrutinize the record as a whole to determine if the decision reached

is reasonable and supported by substantial evidence."  Bloodsworth, at 1239 (citations

omitted).  Substantial evidence is "such relevant evidence as a reasonable person would

accept as adequate to support a conclusion."  Bloodsworth, at 1239.   This court may not

decide the facts anew, reweigh the evidence, or substitute its judgment for that of the

Commissioner.  Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990).  Even if the

court finds that the evidence preponderates against the Commissioner's decision, the

court must affirm the Commissioner's decision if it is supported by substantial evidence.

Ellison v. Barnhart, 355 F.3d 1272, 1275 (11th Cir. 2003).

## II.  STATUTORY AND REGULATORY FRAMEWORK

In order to qualify for disability benefits and to establish entitlement for a

period of disability, a claimant must be disabled.  The Act defines disabled as the

"inability to engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to result in death or

which has lasted or can be expected to last for a continuous period of not less than twelve

months . . . ."  42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 416(I).  For the purposes of

establishing entitlement to disability benefits, "physical or mental impairment" is defined

as "an impairment that results from anatomical, physiological, or psychological

abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § 423(d)(3).

In determining whether a claimant is disabled, Social Security regulations outline a five-step sequential process.  20 C.F.R. § 404.1520 (a)-(f).  The Commissioner must determine in sequence:

(1)    whether the claimant is currently employed;

(2)    whether she has a severe impairment;

(3)    whether her impairment meets or equals one listed by the Secretary;

(4)    whether the claimant can perform her past work; and

(5)    whether the claimant is capable of performing any work in the national economy.

Pope v. Shalala, 998 F.2d 473, 477 (7th Cir. 1993); accord  McDaniel v. Bowen, 800 F.2d 1026, 1030 (11th Cir. 1986).  "Once the claimant has satisfied Steps One and Two, she will automatically be found disabled if she suffers from a listed impairment.  If the claimant does not have a listed impairment but cannot perform her past work, the burden shifts to the Secretary to show that the claimant can perform some other job."  Pope, at 477; accord Foot v. Chater, 67 F.3d 1553, 1559 (11th Cir. 1995).

In the present case the ALJ determined the plaintiff met the first two tests, but concluded she did not suffer from a listed impairment.  The ALJ found the plaintiff had the residual functional capacity ("RFC") to perform light work with additional restrictions.  R. 32.  He found she could not climb ladders, ropes or scaffolds; but could

3

frequently climb ramps and stairs, balance, stoop, kneel, crouch and crawl.  R. 32.  She

was also to avoid concentrated exposure to fumes, odors, dusts, gases and poor

ventilation.  R. 32  She could not work around heights, machinery or other workplace

hazards.  R. 32.  With this RFC, the ALJ found the plaintiff was able to perform her past

relevant work as a dispatcher.  R. 35.  Accordingly, the ALJ found the plaintiff was not

disabled.

### III.  FACTUAL BACKGROUND

The plaintiff alleges she is disabled due to symptoms, primarily headaches,

related to pseudotumor cerebri.[1]  She alleges she became unable to work on October 2,

2005.

On October 6, 2005, the plaintiff was seen by her primary care physician

with a low grade fever, nasal drainage, a scratchy throat, nausea, and vomiting secondary

to a vascular headache.  R. 159.  She was diagnosed with nasopharyngitis and intractable

vomiting secondary to vascular headache.  R. 159.  An MRI was ordered which showed

chronic sinusitis.  R. 159.  At a follow-up visit on October 19, 2005, the plaintiff was

diagnosed with nasopharyngitis, sinusitis, and cervical muscle spasm.  R. 159.  On

---

[1]  "Pseudotumor cerebri . . . occurs when the pressure inside your skull
(intracranial pressure) increases for no obvious reason. Symptoms mimic those of a brain
tumor, but no tumor is present. Pseudotumor cerebri can occur in children and adults, but
it's most common in obese women of childbearing age."
http://www.mayoclinic.com/health/pseudotumor-cerebri/DS00851

October 24, 2005, the plaintiff was seen complaining that she had been sick for a month. R. 158.  She was diagnosed with pharyngitis and fatigue.  R. 158.  When the plaintiff returned on November 4, 2005, she complained of a sore throat, cough and earache.  R. 157.  She was diagnosed with eustachian tube dysfunction and a cough.  R. 157.  It was believed she might have some sort of fungal sinus infection because she had recently moved away from a house that had mold in it.  R. 157.

On February 20, 2006, the plaintiff was seen by Dr. Eslami, a neurologist. R. 189.  The plaintiff reported a history of childhood headaches, but that she had been headache free for 10 years.  R. 189.   She reported she started having headaches again about 18 months to two years previously.  R. 189.  She reported she had been using excessive amounts of over-the-counter medications, which had not alleviated her headaches.  R. 189.  On examination Dr. Eslami found the plaintiff's strength, coordination, gait, and cerebellar function were normal.  R. 189.  Dr. Eslami's found the plaintiff's headaches and papilledema[2] represented the classic presentation of pseudotumor cerebri.  R. 189.  Dr. Eslami also diagnosed over-the-counter rebound headache.  R. 189.  The plaintiff was prescribed Topamax and advised to cease using over-the-counter painkillers within a couple of weeks.  R. 189.  The plaintiff was also to have a lumbar spinal tap to reduce intracranial pressure.  R. 109.

_____

[2]  "Papilledema is a swelling of the optic nerve, at the point where this nerve joins the eye, that is caused by an increase in fluid pressure within the skull (intracranial pressure)."  http://medical-dictionary.thefreedictionary.com/papilledema

On March 20, 2006, the plaintiff returned to Dr. Eslami for follow-up.  She reported that for a time her headaches had improved after the lumbar puncture, but had returned.  R. 188.  She complained of a continuous headache, hearing a "swishing" sound in her head, and seeing black spots in her visual field.  R. 188.  Dr. Eslami noted the plaintiff's pseudotumor cerebri was not improving.  R. 188.  A repeat lumbar puncture was scheduled and Vicoprofen was prescribed.  R. 188.

On April 24, 2006, the plaintiff returned to Dr. Eslami.  She reported she had not had the repeat lumbar puncture, as it was quite painful.  R. 187.  She also reported that her headache was severe and "getting worse."  R. 187.  Dr. Eslami scheduled the plaintiff for another lumbar puncture and she was to continue current medications.  R. 187.  The plaintiff had a lumbar puncture on April 27, 2006.  R. 190.

On May 3, 2006, the plaintiff called Dr. Eslami's office complaining of a severe headache.  R. 187.  She was advised to decrease her Topamax dosage and to return for a follow-up visit on May 11, 2006.  R. 187.  The plaintiff's follow-up visit was rescheduled for May 19, 2006, because she had no transportation.  R. 187.  The rescheduled appointment was also canceled because of no transportation.  R. 187.  There are no records of any further visits to Dr. Eslami.

In June 2006 the plaintiff had blood testing performed at the Cholesterol Center in Cincinnati Ohio to determine "whether, and to what degree, [plaintiff had] an increased tendency to form blood clots (thrombophilia) or a reduced ability to dissolve

blood clots (hypofibrinolysis)." R. 198. The results showed the plaintiff had some abnormal results that indicated an increased tendency to form blood clots. R. 202.

On July 17, 2006, the plaintiff was seen in the emergency room at Cullman Regional Medical Center complaining of a headache that had started three days previously. R. 250. The plaintiff was treated and released with a pain rating of 4/10. R. 251.

On March 7, 2007, the plaintiff was seen at Quality of Life Health Services for a headache, toothache and sinus pain. R. 298. She was diagnosed with sinusitis and dental caries with a possible abscess. R. 299.

On May 7, 2007, the plaintiff was seen at the Woodland Medical Center. Her chief complaint was headache. R. 387. The plaintiff reported experiencing pain and pressure behind her right eye, but no blurred vision. R. 387. She also reported she had blacked out for a few seconds 2 to 3 times during the day. R. 388.

On May 16, 2007, the plaintiff was seen in the ER complaining of a headache of 12 hours duration. R. 363. She reported nausea and vomiting as associated symptoms. R. 363. She rated her pain as 10/10. R. 365. The clinical impression was migraine headache. R. 364.

On June 26, 2007, the plaintiff was seen in the ER with a migraine headache which she rated as moderate to severe. R. 347. She also reported photophobia and mild dizziness. R. 347.

The record contains a letter dated June 26, 2007, from Dr. Glueck at the

Cholesterol Center in Cincinnati Ohio.  The letter reads as follows:

> We evaluated you because of a clear diagnosis of Pseudotumor Cerebri.
> We discovered multiple coagulation disorders associated with this disease
> along with strong evidence for Polycystic Ovary Syndrome also associated
> with this disease.  I have attached a copy of our report sent to you on
> 6/15/06.  There is no question based on our evaluation here and the
> information which you provided us that you have this disorder and as such
> need appropriate continuing treatment for this disorder which as in your
> case is medically disabling.  Many thanks.

R. 324.

The record also contains a number of other treatment notes unrelated to

headaches or the plaintiff's pseudotumor cerebri.

## IV. DISCUSSION

### A.

The plaintiff's argues the ALJ erred in failing to find a closed period of

disability lasting at least twelve months.  Pl.'s Br. 8.  The plaintiff argues the report of

the State agency physician, Dr. Langford, was conditioned on the plaintiff improving

with treatment.  Pl.'s Br. 8.  Dr. Langford opined that the plaintiff would be capable of

light work as of October 2, 2006, if she complied with treatment recommendations.[3]  R.

203.  The ALJ summarized Dr. Langford's opinion as follows:

> The state agency medical consultant noted on July 12, 2006, that the
> claimant's condition, pseudotumor cerebri and papilledema, would need

---

[3]   See Def.'s br. p.5, n. 6 (explaining the meaning of technical language and
codes in Dr. Langford's opinion).

strict dieting, avoidance of vitamin A and close pressure monitoring; with compliance, improvement could be expected within 12 months so that she could perform light work-related activities.

R. 34.

In concluding the plaintiff had not shown she would be unable to perform light work, the ALJ noted she had been "only marginally compliant with the treating instructions of her physicians." R. 35.  However, he also noted the plaintiff had numerous doctor and emergency room visits where she responded to treatment, and at which few limitations were imposed.  R. 35.  He found the plaintiff "responded well to treatment and the evidence is inconsistent with her report of subjective symptoms."  R. 35.  The ALJ concluded:  "Therefore, so long as she complies with her physicians' treatment instructions, the evidence does not show that she is unable to perform light work as described by the state agency medical consultant in exhibit 7F."  R. 35.

The medical records, summarized above, show the plaintiff received no treatment for headaches related to her pseudotumor cerebri from July 17, 2006, until May 7, 2007.  After June 26, 2007, the medical records do not document any further treatment for headaches related to the plaintiff's pseudotumor cerebri prior to her ALJ hearing, which was held August 19, 2008.  Therefore, the medical record shows the plaintiff received significant treatment for symptoms related to her pseudotumor cerebri from her alleged onset date of October 2, 2005, through July 17, 2006.  However, there is an almost ten month gap in treatment for those symptoms from July 17, 2006, until May 7,

2007.  This gap in treatment provides substantial evidence to support the ALJ's finding that the plaintiff's condition improved within twelve months of her alleged onset date. There is another large gap in documented treatment for those symptoms after June 26, 2007, which supports the ALJ's finding that the plaintiff had not been disabled at any time from her alleged onset date through the date of his decision.

**B.**

The plaintiff's next argument on appeal is that the ALJ failed to give proper credit to Dr. Glueck's letter stating that the plaintiff's disorder was medically disabling.  The ALJ did not give controlling weight to Dr. Glueck's statement because "he gave no specific limitations or any particular reason why the claimant's condition was disabling."  R. 35.  The regulations provide the opinions of treating doctors may be accorded controlling weight if they are well supported:

> If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

20 C.F.R. § 404.1527(c)(2).  However, not all opinions from doctors are considered medical opinions entitled to controlling weight.  The regulations provide that opinions on issues reserved to the Commissioner are not medical opinions.

> Opinions on some issues, such as the examples that follow, are not medical opinions . . . but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability.

> (1) *Opinions that you are disabled.* We are responsible for making the determination or decision about whether you meet the statutory definition of disability.  In so doing, we review all of the medical findings and other evidence that support a medical source's statement that you are disabled.  A statement by a medical source that you are "disabled" or "unable to work" does not mean that we will determine that you are disabled.

20 C.F.R. § 404.1527(d).  The ALJ correctly applied the above regulation in finding Dr. Glueck's statement was not entitled to controlling weight.  The records from Dr. Glueck consist entirely of lab reports from blood testing.  The results state that the blood testing was for the purpose of evaluating "factors, which could cause blood clots and how the body dissolves blood clots."  R. 198.  There is nothing in the test results to show how the plaintiff's symptoms would affect her ability to perform work related activities.  Therefore, Dr. Glueck's statement was not a medical opinion, and the ALJ did not err in refusing to give it controlling weight

## C.

The plaintiff argues the ALJ failed to properly develop the record by either recontacting Dr. Glueck for clarification of his opinion, or obtaining a consultative examination.  Pl.'s Br. 10.  The regulation on recontacting medical sources in effect at the time of the ALJ's decision provided in pertinent part as follows:

> When the evidence we receive from your treating physician or psychologist or other medical source is inadequate for us to determine whether you are disabled, we will need additional information to reach a determination or a decision. To obtain the information, we will take the following actions.

> (1) We will first recontact your treating physician or psychologist or other medical source to determine whether the additional information we need is readily available. We will seek additional evidence or clarification from your medical source when the report from your medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques.

20 C.F.R. §§ 404.1512(e)(1998)(emphasis added).  Under the regulation, the duty to recontact a treating physician only arises if the medical evidence of record "is inadequate" to allow the ALJ "to determine whether [a claimant is] disabled."  Id.

Because Dr. Glueck's statement that the plaintiff is disabled is not a medical source opinion, it did not create an ambiguity or conflict that had to be resolved in order for the ALJ to reach a decision.  Therefore, the ALJ did not err in failing to recontact Dr. Glueck.

The plaintiff argues the ALJ erred in failing to order a consultative examination.  A consultive examination may be requested if there is insufficient medical evidence from a claimant's medical sources to determine whether she is disabled.  20 C.F.R. §§ 404.1517, 416.917.  The plaintiff argues the evidence is insufficient because there was no longitudinal documentation of the plaintiff's weight.  Pl.'s Br. 10.  However, the medical record contains notations of the plaintiff's weight in November 2005, January 2006, May 2006, June 2006, October 2006, December 2006, February 2007, and May 2007.  R. 157, 308, 246, 306, 304, 395.  Over this time the plaintiff's weight fluctuated between 250 and 289 pounds.  At the plaintiff's ALJ hearing on August 18, 2008, she

testified that she weighed approximately 280 pounds.  R. 60.  She testified that she had lost weight  at times, but then gained it back.  R. 60.  Therefore, contrary to plaintiff's argument, the record contains evidence documenting the plaintiff's weight during the relevant time period.

Although the plaintiff cites to Social Security Ruling 02-1p, which explains how obesity is evaluated in disability determinations, she cites to no evidence showing her obesity affects her residual functional capacity.  The Commissioner's regulations require a claimant to produce evidence showing that she is disabled:

> In general, you have to prove to us that you are blind or disabled. Therefore, you must bring to our attention everything that shows that you are blind or disabled. This means that you must furnish medical and other evidence that we can use to reach conclusions about your medical impairment(s) and, if material to the determination of whether you are blind or disabled, its effect on your ability to work on a sustained basis. We will consider only impairment(s) you say you have or about which we receive evidence.

20 C.F.R. § 404.1512(a).  When a claim is not decided based upon the Listings at step three, how the claimant's medical impairment affects her ability to work becomes an issue.  Therefore, at step four § 404.1512(a) the burden is on the plaintiff to "furnish medical and other evidence" about her impairment and "its effect on [her] ability to work on a sustained basis."  The Supreme Court has observed "[i]t is not unreasonable to require the claimant, who is in a better position to provide information about his own medical condition, to do so." Bowen v. Yuckert, 482 U.S. 137 (1987) Id. 482 U.S. at 146, n. 5.

The record shows the plaintiff was able to work in spite of her obesity up until October 2005.  At her hearing, she testified that it was headaches that prevented her from working.  The plaintiff presented no evidence showing she was more restricted by her obesity than found by the ALJ in his RFC finding.  Therefore, the ALJ did not err in failing to order a consultative evaluation or in finding the plaintiff was not disabled in spite of her obesity.

### V.  CONCLUSION

The court concludes the ALJ's determination that the plaintiff is not disabled is supported by substantial evidence, and that the ALJ applied the proper legal standards in arriving at this decision.  Accordingly, the Commissioner's final decision is due to be affirmed. An appropriate order will be entered contemporaneously herewith.

**DONE**, this 24th day of September, 2013.


SHARON  LOVELACE  BLACKBURN
CHIEF UNITED STATES DISTRICT JUDGE

14